UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| MOSES D. FULTON, | ) | Civil Action No.: 4:11-3239-RBH-TER |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -vs- | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| | ) | |
| MARTEK BIOSCIENCES KINGSTREE | ) | |
| CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |
| ——————————————— | ) | |

## I.     INTRODUCTION

This action arises out of Plaintiff's employment with Defendant Martek Biosciences Kingstree Corporation.  Plaintiff alleges his employment was terminated based on his race in violation of Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 2000(e) et seq. Presently before the Court is Defendant's Motion for Summary Judgment (Document # 20).  All pretrial proceedings in this case were referred to the undersigned pursuant to the provisions of 28 U.S.C. § 636(b)(1)(A) and (B) and Local Rule 73.02(B)(2)(g), DSC.  Because this is a dispositive motion, this Report and Recommendation is entered for review by the district judge.

## II.    FACTS

### A.     The Kingstree Plant

Defendant Martek Biosciences Corporation operates a facility in Kingstree, South Carolina where it produces products made from microalgae. These products consist primarily of Omega-3 and Omega-6 fatty acids. Plaintiff worked in two production departments of the Kingstree facility, "ARA Extraction" and "RBD." The ARA Extraction Department extracts Omega-6 fatty acids from algae.

RBD is an abbreviation for Refining, Bleaching, and Deodorizing, processes that are performed before the product is marketed. The products are used as a food and nutritional additives, so purity, color, and odor are important.  Pl. Dep. 21-22.

### B.    Plaintiff's Employment with Martek

#### 1.    Employment, Training and Advancement

Plaintiff was hired on December 27, 2004 as a Manufacturing Technician in the RBD Department.  Pl. Dep. 17-18, Ex. 1.  Plaintiff spent his first year working and training exclusively in the RBD Department. Manufacturing Technicians (also known as Production Operators) at Martek are divided into three levels - A, B, and C - based upon acquired skill levels in a particular department.  Production Operators also have different levels of pay, referred to as 1, 2, and 3. To move from Level 1 pay grade to Level 2 pay grade, the Operators must develop increased skill levels in one department. To move from Level 2 pay grade to Level 3 pay grade, the Operators must develop significant skills in more than one department.  Pl. Dep. 22-23.  Because Plaintiff developed his skills in RBD during his first year, he was promoted from Manufacturing Tech 1 to Manufacturing Tech 2 on April 1, 2006 and he received a raise of approximately $1.50 per hour. Pl. Dep. 27, Ex. 6. Other than the wage increases awarded for moving from Manufacturing Tech 1 to Manufacturing Tech 2 or 3, the only other increase that Manufacturing Technicians receive are annual increases. Plaintiff could not be promoted to Manufacturing Tech 3 until he acquired skills in another department.  Pl. Dep. 28.  Plaintiff's supervisor, Danny Godwin, periodically rotated Plaintiff to the ARA Extraction Department for training to qualify him for advancement.  Pl. Dep. Exs. 11, 12.  Later in his career, on March 1, 2009, Plaintiff was promoted to a Level 3 Operator, because he had achieved C-Operator status in RBD and B-Operator status in ARA.  Pl. Dep. 55-56,

Ex. 27.  Level 3 is the highest level a Manufacturing Technician can achieve. Pl. Dep. 58.

### 2.    Initial Attendance/PTO Issues

#### a.    First Corrective Action

Plaintiff received his first Employee Corrective Action Notice on August 7, 2006 for repeatedly taking unscheduled time off ("PTO") when he had no PTO available. Pl. Dep. Ex. 10. Plaintiff's "last minute" absences were disruptive as there were only two Operators in RBD on Plaintiff's shift. If Plaintiff called in at the last minute, the workforce was cut in half.  Pl. Dep. 42. Godwin noted that he talked to Plaintiff on several occasions about attendance, including the need to build up PTO hours for emergency, not calling in at least 24 hours in advance and not being allowed to take PTO that he had not earned.  Godwin wrote:

> After numerous counseling sessions Moses continues to disregard and abuse the attendance policy. For this reason I am giving him a written warning and putting him on notice that any further abuse may result in discipline up to and including termination. In addition, any PTO requests for Moses must be approved by me personally or by Don Carr in my absence.

Pl. Dep. Ex. 10.  In response to the Corrective Action, Plaintiff explained that the passing of his ex-wife resulted in him having to take custody of his two other children in addition to his one year old child, one of whom has medical issues.  Id.

#### b.    Second Corrective Action

Despite the August 7, 2006, warning, Plaintiff's attendance problems persisted. He received a second written Employee Corrective Action notice on March 28, 2007 for excessive use of emergency PTO. Godwin noted:

> I have talked to Moses on several occasions about his attendance, including; the need to build up PTO hours for emergencies, not calling in at least 24 hrs in advance, and not being allowed to take PTO time that you haven't earned. I have explained to

> Moses that this abuse of the attendance policy cannot continue. The plant cannot function if employees can't be depended on. When an employee does not show up or leaves early, someone has to be called in or work does not get done on schedule. For this reason I am giving him a second written warning in seven months and putting him on notice that any further abuse of this policy may result in further discipline up to and including termination.

Pl. Dep. Ex. 17.

### 3.     "Non-Conformance" Issues

Production Operators are required to keep records of production activities and data during each shift. This can include temperatures, formulas, and other items which appear in standard operating procedures.  Pl. Dep. 46.  A "non-conformance" is a production or record-keeping error on the part of a Production Operator. Plaintiff had persistent problems with non-conformances during his entire tenure with Martek.

Under Martek's policy, if an Operator has three or more errors in a month the supervisor reviews the mistakes with the Operator and documents the coaching session. If no improvement is noted, a written warning or more serious discipline is issued. The current goal is 36 errors or less per year, or ten or fewer per quarter per Operator.  Pl. Dep. Ex. 20; Pl. Dep. Ex. 32.

Until the Summer of 2007, Plaintiff had been supervised by Danny Godwin. In the Summer of 2007, Godwin moved into another position with Martek and Billy Poston became the Supervisor of C Shift. Poston was formerly a Lead Operator on B Shift. He had never worked with Plaintiff before.  Pl. Dep. 43-44.  Plaintiff testified that he had never had any prior problems with Poston. However, Plaintiff admitted that Poston's management or supervisory style was different from Godwin's.  Pl. Dep. 44-45. Plaintiff said that Poston was "on top of paperwork" and did a better job of keeping up with the training records and production records.  Id.  Plaintiff testified that Poston

paid more attention to non-conformances than Godwin, and was more likely to point out a non-conformance and "write up" employees for non-conformance. Pl. Dep. 46-47. Plaintiff testified that Poston would have coaching sessions about nonconformances with him, and would "write him up" if problems were not resolved. Pl. Dep. 47.

Plaintiff received documented coaching from Poston for having three non-conformances in the month of October 2007 and seven in the month of November 2007. Pl. Dep. Ex. 20-21. He also received a documented non-conformance coaching session on February 22, 2008. Pl. Dep. Ex. 23.

### 4.    Three-Month Probation For Continued Attendance/PTO Abuse

Notwithstanding his prior discipline due to attendance issues, Plaintiff's problems persisted into 2008. On February 1, 2008, Plaintiff was placed on probation for excessive use of emergency PTO. The details of the infraction were as follows:

> This written warning is for abusing the Emergency PTO policy. Moses has accumulated 4 occurrences in a six month period. On two occasions Moses left early and on three occasions incurred unscheduled absences. The infraction dates are as follows; 9/17/07 left 5 hours early, 10/09/07 left 3 hours early, 10/28/07 called in and 12/23/07 called in. Moses presented a doctor's excuse for 12/26/07, 12/27/07, and 12/31/07 which would count as one occurrence per our attendance guidelines. Moses has been issued two written warnings since his employment, one on 8/7/06 and another on 3/28/07. It was made clear to him at that time our expectations for him to schedule his PTO accordingly within the attendance guidelines. Plaintiff was placed on a three-month probation and told not to take any emergency PTO during this period.

Pl. Dep. Ex. 22.

### 5.    Written Warning for Failure to Follow Standard Operating Procedures

On August 13, 2008, Plaintiff received another written warning for not following standard operating procedures (SOP), resulting in a significant loss of product. Plaintiff did not follow the proper procedures for disposing of soaps which resulted from the process. Approximately 400kg of

product was lost as a result. Pl. Dep. Ex. 24.

**6.      Six-Month Probation For Continued Abuse of Attendance/PTO Policies**

On September 21, 2009, Poston put Plaintiff on six-month probation for further excessive occurrences under the Martek Attendance Guidelines. Since he had received two corrective action notices and a ninety-day probation previously, he was placed on six-month probation and was not allowed any other violations of the attendance policy. Plaintiff was told that he must schedule all PTO per Company guidelines and could not take any PTO that had not been scheduled at least seven days in advance. Pl. Dep. 28. Plaintiff did not accumulate any additional attendance violations after he was placed on probation on September 21, 2009, until his termination on January 20, 2010.

**7.      Plaintiff Receives A "Needs Improvement" Evaluation**

Shortly thereafter, Plaintiff received a "needs improvement" performance evaluation on November 16, 2009. Pl. Dep. 29. This "needs improvement" evaluation was based largely on the need to reduce batch record non-conformances and his continued attendance problems. As the evaluation stated, "Moses needs to review documentation during shift and at shifts end, to reduce his batch record non-conformances." Id.

**C.      Plaintiff's Termination**

A Technician is expected to have ten (10) or fewer batch record non-conformances per quarter.  Plaintiff had twenty-one (21) non-conformances in the quarter ending in August, September, and October 2009. He had five (5) additional non-conformance errors in November 2009, eight (8) in December and eight (8) from January 1 through January 15, 2010. As a result of his continued excessive non-conformances and in light of his past disciplinary record, his employment was terminated effective January 20, 2010.  The Corrective Action read:

> Manufacturing technicians are expected to accumulate 10 or fewer batch record non-conformances per quarter. As of January 15, 2010, Moses has accumulated 16 non-conformances. Moses had 21 non-conformances last quarter (August – October 2009). Moses received a needs improvement rating on his last performance evaluation (11/1/2008-10/31/2009). One of the areas for Moses to concentrate on in order to improve was batch record non-conformances. Moses has not made any progress in this area. Moses has also been coached on this matter since his evaluation and understood that if improvement did not occur, he may be subjected to further disciplinary action up to and including dismissal.

Pl. Dep. Ex. 32. Prior to his termination, Plaintiff had not previously received any Employee Corrective Action Notices regarding Non-Conformance errors, although such errors were included in the "previous infractions" section of his Termination Notice.

Plaintiff admitted that he understood "that if you had excessive non-conformances it could lead to disciplinary action and even termination." Pl. Dep. 49. Plaintiff acknowledged that he committed the errors that were the focus of his termination on January 25, 2010. Pl. Dep. 93.

Notwithstanding Plaintiff's admission that he had excessive batch record non-conformances, he alleges that other non-minority employees have had the same or worse records of non-conformance without being terminated. However, Plaintiff admitted that he had no knowledge of other employees' disciplinary records or performance appraisals. Pl. Dep. 67. Defendant maintained records of the batch record non-conformances for all employees in Plaintiff's department for calendar years 2007 through 2010. The records run from November through October to coincide with the employee evaluation schedule. From November, 2007 to October, 2008 Plaintiff's non-conformances totaled eighty-three. This was nearly twice the amount of the next highest number for employee Rusty Dorrell at forty-five. From November, 2008 to October, 2009, Plaintiff's fifty-five non-conformances were 71% higher than the next highest number for employee Michael Langley at thirty-two. During the last three months of his employment, Plaintiff's

twenty-one non-conformances were more than double the next highest number on his shift for employee Chuck Walker at ten.  Lee Aff. Ex. 1.

### D.    Other Employees

#### 1.    Gerald Timmons

Plaintiff alleges that a white employee named Gerald Timmons made the "same errors" as Plaintiff and was transferred to another area instead of being terminated.  However, Timmons was working in a different job (Lead Operator), on a different shift, and with a different supervisor (Mike Sauls).  Pl. Dep. 69.  Plaintiff admitted he has no knowledge of Timmons' record of non-conformances and that it was possible Timmons made fewer errors than Plaintiff.  Pl. Dep. 69. Timmons had eleven non-conformances in November and December 2009, and January 2010 which ranked him sixth in the Department. Plaintiff had twenty-one non-conformances in the same period which ranked him as having the highest number of non-conformances.  Lee Aff. Ex 1.

In fact, Timmons had difficulty as a Team Leader and was demoted to Manufacturing Technician 1. Timmons received a verbal warning on January 21, 2010 for calculation errors resulting in a loss of product.  Lee Aff. Ex. 3.  He also received a written warning on December 5, 2008, for a failure to follow an SOP.  Lee Aff. Ex 2.  On February 12, 2010, Timmons received a written warning and was demoted for giving a new employee working under him incorrect information.  Lee Aff. Ex. 4.

#### 2.    Matthew Evans

While Plaintiff admitted that he has no direct evidence of racial discrimination directed toward him, he stated that an employee named "Ken Turner" referred to an African-American employee named Will Rogers, as a "nigger."  Pl. Dep. 65.  Plaintiff heard about this in the plant, but

has no direct knowledge of the incident or how the incident was investigated and handled.  Pl. Dep. 66.  The incident did not involve Plaintiff or anyone in Plaintiff's department.  Id.

In fact, Ken Turner was not the employee who made the statement. Ken Turner was a Senior Engineer who heard the comment and reported it to Brian Lee in Human Resources.  The comment was made by an employee named Matthew Evans, who was engaged in a conversation with Will Rogers.  The incident was fully investigated by Human Resources and Lee concluded that Evans was attempting to be funny and realized too late that he had gone too far.  Evans was suspended without pay for a week and warned that further incidents would result in termination.  Lee Aff. ¶ 6, Lee Dep. 46-48.

### 3.    Sparky Avant

Plaintiff also complained that a white employee should have been terminated for an incident that occurred when he was temporarily assigned to the Company's plant in Winchester, Kentucky. Plaintiff received all of his information from "rumors in the plant."  Pl.'s Dep. 70-71.  In fact, employees Sparky Avant and Ross Powell were temporarily assigned to Martek's Winchester Plant. They failed to show up because Powell was arrested for DUI. Avant, who was a passenger in the car, was also arrested for an alcohol-related offense. Ross Powell was terminated. Avant received a one-week suspension for poor judgment. Avant had an otherwise clear disciplinary record.  Lee Aff. ¶ 7, Lee Dep. 54.

### 4.    Brian Lowder

Plaintiff also complained that employee Brian Lowder had more no-call/no-shows than he did; Plaintiff admitted he had no knowledge of Brian Lowder's attendance record.  Pl. Dep. 72-73. Lowder was a Warehouse Operator working in the Materials Department under the supervision of

Ross Hundley and Jimmy Boyington. Lowder received an Employee Corrective Action Notice on April 9, 2008, for making careless errors. Lee Aff. Ex. 5. He received a Corrective Action Notice from Jimmy Boyington on May 12, 2008, for one "No Call/No Show" and two absences. Lee Aff. Ex. 6. Approximately one year later, on March 2, 2009, he received another written warning for three absences in a short period of time. Lee Aff. Ex. 7.

### 5.     C.R. Altman

Plaintiff complained that employee C.R. Altman was not terminated as a result of a sexual harassment investigation. Plaintiff has no knowledge of the investigation or the resolution of the investigation. Pl. Dep. 73-74. Altman, who was a supervisory employee, was the subject of a sexual harassment complaint alleging a hostile work environment. Mr. Altman admitted making inappropriate comments. He was demoted from his supervisory position and suspended without pay for a week. Lee Aff., Lee Dep. 43.

### 6.     Joe Weatherford

In 2006, Joe Weatherford, an IT administrator and a white male, was given a written notice and placed on probation for 2 months for being tardy on at least 50 occasions for the period of January 1, 2006 to July 31, 2006. Joe had been warned about excessive tardiness before in December 2005. Ex. B to Pl. Response. While Plaintiff and Weatherford did not work for the same department, the corrective action notices for both were signed by the same person, Brian Lee, the Senior HR Manager. Lee testified that his signature meant that he reviewed the document placed in the employee's file and "support[ed]" it." Lee Dep. 110. Additionally, Defendant's policy states, "No disciplinary actions will be taken without the direct involvement of the Human Resources Department as counsel to management." Management Site Guidelines (attached as Ex. F to Pl.

Response) p. 3.

Subsequently, Weatherford was allowed to work from home at times because he was going through a divorce. Brian Lee testified that Weatherford was "understandably out a bit" in 2009 because of his divorce and getting custody of his children. Lee Dep. 126-28.

**7.    Nikki Lee**

Nikki Lee, a white female who worked in the Quality Control Department as a Senior QC Analyst, left work early without permission, was disruptive and insubordinate. She exhibited disruptive behavior toward her supervisor twice in 2005 and in 2006 and was issued a corrective action notice in January 2007. She received a second written notice and probation in May of 2007 for engaging in disruptive behavior twice more. Nikki Lee Corrective Action (attached as Ex. H to Pl. Response). Nikki Lee is still employed with Defendant.

## III.    STANDARD OF REVIEW

The moving party bears the burden of showing that summary judgment is proper. Summary judgment is proper if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Summary judgment is proper if the non-moving party fails to establish an essential element of any cause of action upon which the non-moving party has the burden of proof. Celotex, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265. Once the moving party has brought into question whether there is a genuine dispute for trial on a material element of the non-moving party's claims, the non-moving party bears the burden of coming forward with specific facts which show a genuine dispute for trial. Fed.R.Civ.P. 56(e); Matsushita Electrical Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The non-moving

party must come forward with enough evidence, beyond a mere scintilla, upon which the fact finder could reasonably find for it. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The facts and inferences to be drawn therefrom must be viewed in the light most favorable to the non-moving party. Shealy v. Winston, 929 F.2d 1009, 1011 (0 Cir.1991). However, the non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment. Barber v. Hosp. Corp. of Am., 977 F.2d 874–75 (4th Cir.1992). The evidence relied on must meet "the substantive evidentiary standard of proof that would apply at a trial on the merits." Mitchell v. Data General Corp., 12 F.3d 1310, 1316 (4th Cir.1993).

To show that a genuine dispute of material fact exists, a party may not rest upon the mere allegations or denials of his pleadings. See Celotex, 477 U.S. at 324. Rather, the party must present evidence supporting his or her position by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed.R.Civ.P. 56(c)(1)(A); see also Cray Communications, Inc. v. Novatel Computer Systems, Inc., 33 F.3d 390 (4th Cir.1994); Orsi v. Kickwood, 999 F.2d 86 (4th Cir.1993); Local Civil Rules 7.04, 7.05, D.S .C.

## IV.    DISCUSSION

Plaintiff alleges that Defendant terminated him because of his race.  Title VII makes it "an unlawful employment practice for an employer-(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex,

or national origin...." 42 U.S.C. § 2000e–2(a)(1).  Plaintiff has not produced direct evidence of race discrimination and, thus, must proceed under the burden-shifting proof scheme established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under this burden-shifting scheme, Plaintiff has the initial burden of establishing a prima facie case of discrimination.  Id.  To establish a prima facie case of race discrimination in a termination case, the plaintiff must present facts showing that (1) he is a member of a protected class; (2) he suffered adverse employment action; (3) he was performing his job duties at a level that met his employer's legitimate expectations at the time of the adverse employment action; and (4) the position remained open or was filled by a similarly qualified applicant outside the protected class.  Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F. 3rd 277, 285 (4th Cir. 2004).  The fourth element can also be met by showing that similarly-situated employees outside the protected class received more favorable treatment, White v. BFI Waste Services, LLC, 375 F.3d 288, 295 (4th Cir. 2004), or other circumstances giving rise to a reasonable inference of unlawful discrimination.  Miles v. Dell, Inc., 429 F.3d 480, 486-87 (4th Cir.2005).

If Plaintiff establishes a prima facie case, the burden shifts to Defendant to produce a legitimate, nondiscriminatory reason for the disparate treatment.  Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 254 (1981).  This is merely a burden of production, not of persuasion.  St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506 (1993).

Once Defendant has met its burden of production by producing its legitimate, nondiscriminatory reason, the sole remaining issue is "discrimination vel non."  Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 143 (2000)(citing Postal Service Bd. of Governors v. Aikens, 460 U.S. 711, 716 (1983)).  In other words, the burden shifts back to Plaintiff to demonstrate by a

-13-

preponderance of the evidence that the legitimate reason produced by Defendant is not its true reasons, but was pretext for discrimination. <u>Reeves</u>, 530 U.S. at 143. Throughout the burden shifting scheme set forth in <u>McDonnell Douglas</u>, the ultimate burden of proving that Defendant intentionally discriminated against Plaintiff remains at all times with Plaintiff. Plaintiff has the ultimate burden of presenting evidence from which a reasonable jury could conclude defendant intentionally discriminated against him.

It is undisputed that Plaintiff is a member of a protected class and that he suffered an adverse employment action when he was terminated. However, Defendant argues that Plaintiff was not meeting his employer's legitimate expectations at the time of his termination. At the time of his termination, Plaintiff was in the middle of a six-month probationary period for excessive absences. This probationary period followed two previous corrective actions regarding his absences and one previous three-month probation for excessive absences. In addition, on November 16, 2009, prior to his termination on January 20, 2010, Plaintiff received a "needs improvement" evaluation. The Performance Appraisal form describes "needs improvement" as "employee has not met most expectations/targets." Pl. Dep. Ex. 29. This evaluation was based in part on Plaintiff's excessive absences and in part on his non-conformances. Employees are expected to have ten or fewer non-conformances per quarter. Plaintiff had twenty-one non-conformances for August through October of 2009. Additionally, from November of 2009 until January 15, 2010, Plaintiff had an additional twenty-one non-conformances.

Plaintiff argues that a question of fact exists as to whether he was meeting his employer's legitimate expectations at the time of his termination because he was on probation for excessive absences at the time of his termination, not for his non-conformances. Thus, Plaintiff argues, with

respect to his job performance, Plaintiff was performing at a level that met his employer's expectations. Regular attendance at work is certainly a legitimate expectation. See, e.g., Tyndall v. Nat'l Educ. Ctrs., Inc. of Cal., 31 F.3d 209, 213 (4th Cir.1994). However, Plaintiff argues that at least one other employee, Joe Weatherford, had attendance issues[1] and was only placed on probation for two months. Plaintiff argues that this example alone creates a question of fact as to whether employees with attendance issues are meeting the employer's expectations. This argument fails for several reasons. First, the issue at this juncture is not whether the termination was proper but whether Plaintiff was meeting his employer's legitimate expectations. The fact that Weatherford was not terminated for his excessive tardies does not mean that he was meeting his employer's legitimate expectations. Indeed, Plaintiff was also placed on probation for his attendance issues on more than one occasion. Furthermore, Plaintiff failed to meet his employer's expectations in other areas, as well. His non-conformances more than doubled the number expected by his employer and his most recent performance evaluation indicated that he was not meeting "most expectations." Thus, Plaintiff's argument regarding his attendance is inapposite here since he had failed to meet expectations in other areas as well.

Plaintiff also appears to argue that he had not received corrective action notices regarding his non-conformances prior to his termination and, thus, a question of fact exists as to whether he was performing at a level that met his employer's expectations. However, Plaintiff had received documented coaching for non-conformances twice in 2007 and once in 2008. In addition, his November 2009 "needs improvement" evaluation noted that Plaintiff needed to reduce his "batch

---

[1] Weatherford's attendance problems arose out of excessive tardies rather than excessive absences.

record non-conformances." Pl. Dep. Ex. 29.  That he had not received a corrective action notice regarding non-conformances does not indicate that he was meeting his employer's legitimate expectations in that area.  He was put on notice on several occasions that he needed to reduce his number of non-conformances and Plaintiff has failed to show that this expectation was not legitimate or reasonable.  Accordingly, Plaintiff fails to present sufficient evidence to meet the third requirement for a prima facie case of discrimination.

Plaintiff also fails to present sufficient evidence to meet the fourth prima facie requirement. Although neither party points to evidence regarding who replaced Plaintiff following his termination, Plaintiff argues that similarly situated employees outside his protected class were treated differently for similar behavior.  To be similarly situated, a "plaintiff must establish that 'other employees' were similarly situated in all relevant respects; that they 'dealt with the same supervisor, [were] subject to the same standards and ... engaged in the same conduct without such mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" See Ward v. City of North Myrtle Beach, 457 F.Supp.2d 625, 643 (D.S.C.2006).  It is undisputed that the employees cited by Plaintiff are outside his protected class.  However, they are similarly situated in few, if any, relevant respects.  They are certainly not similar in all relevant respects.

Joe Weatherford, discussed above, was an IT administrator.  He had fifty or more tardies during a seven month period in 2006.  He was given a two month probation.  Plaintiff fails to point to any other aspects of his work performance.  Weatherford is not similarly situated in that he worked in a different department, held a different position, dealt with a different supervisor and engaged in different conduct.  Weatherford attendance problems involved tardies rather than absences.  Furthermore, there is no evidence that Weatheford's tardies created a hardship for

-16-

Defendant like Plaintiff's absences did because Plaintiff was one of only two Operators in RBD on his shift.

Nikki Lee was a Senior QC Analyst in the Quality Control Department. She left work early without permission, was disruptive and insubordinate. She received corrective action notices and probation for this behavior. Lee is not similarly situated to Plaintiff because she worked in a different department under a different supervisor, held a different position and engaged in different conduct.

Gerald Timmons was a Lead Operator who was later demoted to Manufacturing Technician I after Plaintiff's termination. He worked a different shift under a different supervisor. He received a verbal warning for on January 21, 2010 for calculation errors. For the November 2009-January 2010 quarter, Timmons received eleven non-conformances as compared to Plaintiff's twenty-one non-conformances during the same quarter. Thus, Timmons is not similarly situated because he held a different position, worked under a different supervisor and engaged in different conduct.

Matthew Evans used the word "nigger" in a conversation with an African American employee. He was suspended without pay for a week. It is not clear in the record the position held by Evans. However, he is not similarly situated to Plaintiff because he did not engage in the same conduct and Plaintiff has failed to show that he was similarly situated in any other respects.

Sparky Avant was temporarily assigned to Defendant's Winchester plant and failed to show up for work after being arrested for an alcohol-related event. He otherwise had a clean disciplinary record. He received a one week suspension for poor judgment. He is not similarly situated to Plaintiff because he engaged in different conduct. Furthermore, Plaintiff fails to show that Avant was similarly situated in any other respects.

-17-

Brian Lowder was a Warehouse Operator in the Materials Department under the supervision of Ross Hundley and Jimmy Boyington. He received a corrective action notice for careless errors, one for three absences, and another for three absences.[2] Plaintiff is not similarly situated to Lowder because they worked in different departments under different supervisors and engaged in different conduct.

C.R. Altman, a supervisory employee, was accused of sexual harassment and admitted making inappropriate comments. He was demoted from his supervisory position and suspended without pay for a week. Plaintiff is not similarly situated to Altman because they held different positions and engaged in different conduct.

Plaintiff argues that all the employees were essentially under the same supervisor because Brian Lee, the senior HR manager, was involved in all disciplinary actions. However, "[w]hen a formal decisionmaker acts merely as a cat's paw for or rubber-stamps a decision, report, or recommendation actually made by a subordinate, it is not inconsistent to say that the subordinate is the actual decisionmaker or the one principally responsible for the contested employment decision...." Hill, 354 F.3d at 290. Even if Lee could be considered the relevant supervisor for purposes of establishing similarly situated employees, Plaintiff still fails to meet that element by failing to show that any of the employees engaged in the same conduct. Plaintiff's argument that the conduct of the other employees was the same as Plaintiff's because they are categorized as Level I, and some as Level II, offenses is unavailing. Plaintiff argues that the conduct does not have to be the same but rather, comparable in seriousness, citing Taylor v. Virginia Union University, 193 F.3d

---

[2]Plaintiff also received two corrective action notices for attendance issues, namely, leaving early on a total of eight occasions. Plaintiff's continued attendance issues following those two corrective action notices resulted in his two probations.

-18-

219, 234 (4th Cir.1999) (en banc), abrogated in part on other grounds by Desert Palace, Inc. v. Costa, 539 U.S. 90, 92 (2003). Nevertheless, "[t]he similarity between comparators and the seriousness of their respective offenses must be clearly established in order to be meaningful." Lightner v. City of Wilmington, 545 F.3d 260, 265 (4th Cir. 2008). Plaintiff has failed to show that the conduct of the other employees was comparable in seriousness.

In sum, Plaintiff fails to present any other employee who can properly be considered a similarly situated employee to satisfy the fourth prong of the prima facie case of discrimination. Accordingly, and for the reasons discussed above, Plaintiff fails to present sufficient evidence to establish a prima facie case of discrimination and, thus, summary judgment is proper.

Furthermore, Defendant has produced a legitimate, non-discriminatory reason for Plaintiff's termination, that is, his repeated, excessive non-conformances, and Plaintiff fails to show that Defendant's legitimate, non-discriminatory reason for his termination was actually pretext for a discriminatory reason. Plaintiff argues that the reason given for his termination is pretext for a discriminatory motive because other employees were not terminated for the same conduct. However, as discussed above, this argument is without merit because Plaintiff fails to show that any other employee engaged in the same or sufficiently comparable conduct.

Plaintiff also argues that Defendants engaged in a pattern of discrimination that affected other African American employees who have also filed Charges of Discrimination against Defendant. As the Fourth Circuit has recognized, "[e]vidence of a pattern or practice of discrimination may very well be useful and relevant to prove the fourth element of a prima facie case ... or that the employer's articulated reasons for the adverse action was merely pretext." Lowery v. Circuit City Stores, Inc., 158 F.3d 742, 761 (4th Cir.1998), vacated on other grounds, 527 U.S. 1031, 119 S.Ct. 2388, 144

L.Ed.2d 790 (1999). However, other than Plaintiff's general assertion that other employees have filed charges of discrimination, Plaintiff fails to present evidence sufficient to show that racial discrimination was a part of Defendant's normal operating procedures.  Plaintiff provides no specifics regarding the discrimination claims raised by other employees  Thus, his pretext argument fails.

In sum, it is Plaintiff's burden ultimately to show that illegal discrimination was the motivating factor in his termination. It is not necessary for this court to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for Defendant's decision. Hawkins v. Pepsico, 203 F.3d 274, 279 (4th Cir.2000); see also Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133 at 146–47, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) ("Proof that the employer's proffered reasons are unpersuasive, or even obviously contrived, ... does not necessarily establish that [Plaintiff's] proffered reason is correct.").  Plaintiff must show that a reasonable jury could believe his explanation of intentional discrimination. Love–Lane v. Martin, 355 F.3d 766, 788 (4th Cir.2004).  Plaintiff has failed to meet his burden of creating a genuine dispute of material fact as to whether his termination was based upon his race. Therefore, summary judgment is appropriate.

## V.    CONCLUSION

For the reasons discussed below, it is recommended that Defendant's Motion for Summary Judgment (Document # 20) be granted and this case be dismissed.

 s/Thomas E. Rogers, III
Thomas E. Rogers, III
United States Magistrate Judge

January 18, 2013
Florence, South Carolina

-20-